## U.S. Bankruptcy Court

### Eastern District of Pennsylvania

Notice of Electronic Claims Filing

The following transaction was received from NICHOLAS, BRIAN on 4/13/2023 at 5:51 PM EST

File another claim

| | |
|---|---|
| **Case Name:** | Jarred E. Fox |
| **Case Number:** | 23-10328-pmm |
| **Creditor Name:** | MidFirst Bank |
| | 999 NorthWest Grand Boulevard |
| | Oklahoma City, OK 73118 |
| **Claim Number:** | 6    Claims Register |

**Amount Claimed:** $180,775.97

**Amount Secured:** $180775.97

**Amount Priority:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**POC Draft- Fox.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=4/13/2023] [FileNumber=31246238-0] [327a21c4ee6fa131bcbafc51088131723d8438ff2a420c8fa26b6cbc56caea5a8d 9f67577ae39f4def327f2bbc22cd13e47c00958a49c2ee6ae555b68f49c943]]
**Document description:**Exhibit 410a Payment History
**Original filename:**C:\fakepath\410a- Fox.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=4/13/2023] [FileNumber=31246238-1] [78746f3ce3ff10eac6ff055fcf2eaf968d556c3ea070210f0442d6142ce11083ec ac4877621fee0208967a64ca87c29228d93de4620cf738efa3eaf72919571c]]
**Document description:**Exhibit Escrow Analysis
**Original filename:**C:\fakepath\EA- Fox.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=4/13/2023] [FileNumber=31246238-2] [7accca9b3f8073c623194b7ffc4adf5701903ecdde9cd3e1f99cc2aedfe1e1fa46 cb008d26cffea2a53e3a86e3523330f33459283c45520d4ae303575513209c]]
**Document description:**Exhibit Loan Documents

**Original filename:** C:\fakepath\Loan Documents- Fox.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=4/13/2023] [FileNumber=31246238-
3] [693b053041049701c1b3d33e35cce0dbe1593d92e5892d6b38e0d0bc5c35dfaad7
603ce28d308b2b9a9747d5a6702f6741d43045aa553947e300ab97fb05a824]]

**23-10328-pmm Notice will be electronically mailed to:**

MICHAEL PATRICK FARRINGTON on behalf of Creditor MIDFIRST BANK
mfarrington@kmllawgroup.com

LORRAINE GAZZARA DOYLE on behalf of Creditor Broker Solutions Inc. dba New American Funding
ldoyle@logs.com, cistewart@logs.com;LOGSECF@logs.com

ALAINE V. GRBACH on behalf of Debtor Jarred E. Fox
avgrbach@aol.com

United States Trustee
USTPRegion03.PH.ECF@usdoj.gov

SCOTT F. WATERMAN [Chapter 13]
ECFMail@ReadingCh13.com

**23-10328-pmm Notice will not be electronically mailed to:**

**Fill in this information to identify the case:**

Debtor 1     Jarred E. Fox
(Spouse, if filing)

United States Bankruptcy Court for the EASTERN District of Pennsylvania

Case number   23-10328 PMM

---

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:    Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | **MIDFIRST BANK**<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☐ No<br>☒ Yes.  From whom?     The Money Source, Inc. _____ |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| **MidFirst Bank**<br>Name | Name |
| **999 NorthWest Grand Boulevard**<br>Number          Street | Number          Street |
| **Oklahoma City, OK 73118**<br>City          State          Zip Code | City          State          Zip Code |
| **1-800-654-4566**<br>Contact phone | Contact phone |
| Contact Email | Contact Email |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☒ No<br>☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____<br>                                                                                                        MM  / DD  / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes.  Who made the earlier filing? _____ |

---

Official Form 410                                      **Proof of Claim**

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6.  **Do you have any number you use to identify the debtor?** | ☐ No<br>☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor    **8478** |

| | |
|---|---|
| 7.  **How much is this claim?** | $180,775.97<br><br>**Does this amount include interest or other charges?**<br><br>☐ No<br>☒ Yes Attach statement itemizing interest, fees, expenses, or other charges<br>required by Bankruptcy Rule 3001 (c)(2)(A). |

| | |
|---|---|
| 8.  **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>**Money Loaned** |

| | |
|---|---|
| 9.  **Is all or part of the claim secured?** | ☐ No<br>☒ Yes.  The claim is secured by a lien on property.<br>    **Nature of property: 94 East Church Street Stevens, PA 17578**<br><br>☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>Basis for perfection:  **Deed of Trust, Mortgage, Note**<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:                    $ _____<br><br>**Amount of the claim that is secured:    $180,775.97**<br><br>Amount of the claim that is unsecured:  $ _____ (The sum of the secured and unsecured<br>                                              amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition: $18,057.24**<br><br>**Annual Interest Rate** (when case was filed) 2.7500%<br><br>☒ Fixed<br>☐ Variable |

| | |
|---|---|
| 10.  **Is this claim based on a lease?** | ☒  No<br><br>☐  Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____ |

| | |
|---|---|
| 11.  **Is this claim subject to a right of setoff?** | ☒  No<br><br>☐  Yes. Identify the property: _____ |

242

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☒ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B) | |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(  ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    __04/13/2023__
               MM / DD / YYYY

__/s/ Brian C. Nicholas__
      Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | __Brian C. Nicholas__ | | |
| | First name | Middle name | Last name |
| Title | __Bankruptcy Attorney__ | | |
| Company | __KML Law Group, P.C.__ | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | __701 Market Street, Suite 5000__ | | |
| | Number    Street | | |
| | __Philadelphia__ | __PA__ | __19106__ |
| | City | State | ZIP Code |
| Contact phone | __201-549-5366__ | Email __bnicholas@kmllawgroup.com__ | |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Jarred E. Fox | CHAPTER 13 |
| Debtor(s) | NO. 23-10328 PMM |

CERTIFICATE OF SERVICE

I, the undersigned, attorney for MIDFIRST BANK do hereby certify that true and correct copies of the foregoing Proof of Claim have been served April 13, 2023, by electronic filing upon those listed below:

Attorney for Debtor(s)
ALAINE V. GRBACH
Alaine V. Grbach, Esquire
675 Estelle Drive
Lancaster, PA 17601

**Bankruptcy Trustee**
Scott F. Waterman
2901 St. Lawrence Ave.
Suite 100
Reading, PA 19606

Date: April 13, 2023

/s/ **Brian C. Nicholas**
Brian C. Nicholas
Attorney I.D. 317240
KML Law Group, P.C.
BNY Mellon Independence Center
701 Market Street, Suite 5000
Philadelphia, PA 19106
201-549-5366
bnicholas@kmllawgroup.com

| Part 1: Mortgage and Case Information | | Part 2: Total Debt Calculation | | Part 3: Arrearage as of Date of the Petition | | Part 4: Monthly Mortgage Payment | |
|---|---|---|---|---|---|---|---|
| Case Number | 23-10328 | Principal Balance: | 169,980.06 | Principal & Interest Due: | 7,936.72 | Principal & Interest: | 721.52 |
| Debtor 1 | JARRED E FOX | Interest Due: | 4,341.47 | Prepetition Fees Due: | 4,184.63 | Monthly Escrow: | 458.26 |
| Debtor 2 | 0 | Fees, Costs Due: | 4,184.63 | Escrow Deficiency for Funds | | Private Mortgage Insurance: | 119.10 |
| Last 4 Digits to Identify | xxxx8478 | | | Advanced: | 3,269.81 | | |
| Creditor | MidFirst Bank | Escrow Deficiency for Funds Advanced: | 3,269.81 | Projected Escrow Shortage: | 3,666.08 | Total Monthly Payment: | 1,298.88 |
| Servicer | MidFirst Bank | Less Total Funds On Hand: | 1,000.00 | Less Funds On Hand: | 1,000.00 | | |
| Fixed Accrual/Daily | | Deferred Balance: | 0.00 | | | Next Due Date: | 3/1/2023 |
| Simple Interest/Other | Fixed | Total Debt: | 180,775.97 | Total Prepetition Arrearage: | 18,057.24 | | |

Part 5: Loan Payment History from First Date of Default

| | | | Account Activity | | | | How Funds Were Applied/Amount Incurred | | | | | Balance After Amount Received or Incurred | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin, Int & Esc Past Due Balance | H. Amount to Principal | I. Amount to Interest | J. Amount to Escrow | K. Amount to Fees or Charges | L. Unapplied Funds | M. Principal Balance | N. Accrued Interest Balance | O. Escrow Balance | P. Fees/ Charges Balance | Q. Unapplied Funds Balance |
| 6/1/2021 | 1,257.78 | | | Contractual Payment Due | 6/1/2021 | 1257.78 | | | | | | 173287.75 | | 2991.53 | 0.00 | 0.00 |
| 6/1/2021 | | | 20.00 | Billed - Inspection Fee | | 1257.78 | | | | 20.00 | | 173287.75 | | 2991.53 | 20.00 | 0.00 |
| 6/4/2021 | | | | MIP Paid | | 1257.78 | | | -121.82 | | | 173287.75 | | 2869.71 | 20.00 | 0.00 |
| 6/16/2021 | | | 28.86 | Late Fees | | 1257.78 | | | | 28.86 | | 173287.75 | | 2869.71 | 48.86 | 0.00 |
| 7/1/2021 | 1,257.78 | | | Contractual Payment Due | 7/1/2021 | 2515.56 | | | | | | 173287.75 | | 2869.71 | 48.86 | 0.00 |
| 7/2/2021 | | | | MIP Paid | | 2515.56 | | | -121.82 | | | 173287.75 | | 2747.89 | 48.86 | 0.00 |
| 7/12/2021 | | | | Taxes Paid | | 2515.56 | | | -2,610.66 | | | 173287.75 | | 137.23 | 48.86 | 0.00 |
| 7/16/2021 | | | 28.86 | Late Fees | | 2515.56 | | | | 28.86 | | 173287.75 | | 137.23 | 77.72 | 0.00 |
| 7/28/2021 | | 1300.00 | | Funds Received | | 2515.56 | | | | | | 173287.75 | | 137.23 | 77.72 | 0.00 |
| 7/28/2021 | | | | Payments Posting | *6/01/2021 | 1257.78 | 324.40 | 397.12 | 536.26 | | | 172963.35 | | 673.49 | 77.72 | 0.00 |
| 7/28/2021 | | | | Suspense Transaction | | 1257.78 | | | | | 42.22 | 172963.35 | | 673.49 | 77.72 | 42.22 |
| 8/1/2021 | 1,257.78 | | | Contractual Payment Due | 8/1/2021 | 2515.56 | | | | | | 172963.35 | | 673.49 | 77.72 | 42.22 |
| 8/2/2021 | | | 20.00 | Billed - Inspection Fee | | 2515.56 | | | | 20.00 | | 172963.35 | | 673.49 | 97.72 | 42.22 |
| 8/4/2021 | | | | MIP Paid | | 2515.56 | | | -119.10 | | | 172963.35 | | 554.39 | 97.72 | 42.22 |
| 8/10/2021 | | | | Taxes Paid | | 2515.56 | | | -674.98 | | | 172963.35 | | -120.59 | 97.72 | 42.22 |
| 8/16/2021 | | | 28.86 | Late Fees | | 2515.56 | | | | 28.86 | | 172963.35 | | -120.59 | 126.58 | 42.22 |
| 9/1/2021 | 1,188.79 | | | Contractual Payment Due | 9/1/2021 | 3704.35 | | | | | | 172963.35 | | -120.59 | 126.58 | 42.22 |
| 9/3/2021 | | | | MIP Paid | | 3704.35 | | | -119.10 | | | 172963.35 | | -239.69 | 126.58 | 42.22 |
| 9/14/2021 | | | 20.00 | Billed - Inspection Fee | | 3704.35 | | | | 20.00 | | 172963.35 | | -239.69 | 146.58 | 42.22 |
| 9/16/2021 | | | 28.86 | Late Fees | | 3704.35 | | | | 28.86 | | 172963.35 | | -239.69 | 175.44 | 42.22 |
| 10/1/2021 | 1,188.79 | | | Contractual Payment Due | 10/1/2021 | 4893.14 | | | | | | 172963.35 | | -239.69 | 175.44 | 42.22 |
| 10/4/2021 | | | | MIP Paid | | 4893.14 | | | -119.10 | | | 172963.35 | | -358.79 | 175.44 | 42.22 |
| 10/15/2021 | | | 20.00 | Billed - Inspection Fee | | 4893.14 | | | | 20.00 | | 172963.35 | | -358.79 | 195.44 | 42.22 |
| 10/18/2021 | | | 28.86 | Late Fees | | 4893.14 | | | | 28.86 | | 172963.35 | | -358.79 | 224.30 | 42.22 |
| 11/1/2021 | 1,245.04 | | | Contractual Payment Due | 11/1/2021 | 6138.18 | | | | | | 172963.35 | | -358.79 | 224.30 | 42.22 |
| 11/4/2021 | | | | MIP Paid | | 6138.18 | | | -119.10 | | | 172963.35 | | -477.89 | 224.30 | 42.22 |
| 11/16/2021 | | | 28.86 | Late Fees | | 6138.18 | | | | 28.86 | | 172963.35 | | -477.89 | 253.16 | 42.22 |
| 11/18/2021 | | | 20.00 | Billed - Inspection Fee | | 6138.18 | | | | 20.00 | | 172963.35 | | -477.89 | 273.16 | 42.22 |
| 12/1/2021 | 1,245.04 | | | Contractual Payment Due | 12/1/2021 | 7383.22 | | | | | | 172963.35 | | -477.89 | 273.16 | 42.22 |
| 12/3/2021 | | | | MIP Paid | | 7383.22 | | | -119.10 | | | 172963.35 | | -596.99 | 273.16 | 42.22 |
| 12/16/2021 | | | 28.86 | Late Fees | | 7383.22 | | | | 28.86 | | 172963.35 | | -596.99 | 302.02 | 42.22 |
| 12/17/2021 | | | 20.00 | Billed - Inspection Fee | | 7383.22 | | | | 20.00 | | 172963.35 | | -596.99 | 322.02 | 42.22 |
| 1/1/2022 | 1,245.04 | | | Contractual Payment Due | 1/1/2022 | 8628.26 | | | | | | 172963.35 | | -596.99 | 322.02 | 42.22 |
| 1/4/2022 | | | | MIP Paid | | 8628.26 | | | -119.10 | | | 172963.35 | | -716.09 | 322.02 | 42.22 |
| 1/18/2022 | | | 28.86 | Late Fees | | 8628.26 | | | | 28.86 | | 172963.35 | | -716.09 | 350.88 | 42.22 |
| 1/21/2022 | | | 20.00 | Billed - Inspection Fee | | 8628.26 | | | | 20.00 | | 172963.35 | | -716.09 | 370.88 | 42.22 |
| 2/1/2022 | 1,245.04 | | | Contractual Payment Due | 2/1/2022 | 9873.30 | | | | | | 172963.35 | | -716.09 | 370.88 | 42.22 |
| 2/4/2022 | | | | MIP Paid | | 9873.30 | | | -119.10 | | | 172963.35 | | -835.19 | 370.88 | 42.22 |
| 2/16/2022 | | | 28.86 | Late Fees | | 9873.30 | | | | 28.86 | | 172963.35 | | -835.19 | 399.74 | 42.22 |
| 2/18/2022 | | | 20.00 | Billed - Inspection Fee | | 9873.30 | | | | 20.00 | | 172963.35 | | -835.19 | 419.74 | 42.22 |
| 2/23/2022 | | | | MIP Paid | | 9873.30 | | | -150.42 | | | 172963.35 | | -985.61 | 419.74 | 42.22 |
| 3/1/2022 | 1,245.04 | | | Contractual Payment Due | 3/1/2022 | 11118.34 | | | | | | 172963.35 | | -985.61 | 419.74 | 42.22 |
| 3/4/2022 | | | | MIP Paid | | 11118.34 | | | -119.10 | | | 172963.35 | | -1104.71 | 419.74 | 42.22 |
| 3/16/2022 | | | 28.86 | Late Fees | | 11118.34 | | | | 28.86 | | 172963.35 | | -1104.71 | 448.60 | 42.22 |
| 3/21/2022 | | 11525.86 | | Funds Received | | 11118.34 | | | | | | 172963.35 | | -1104.71 | 448.60 | 42.22 |
| 3/21/2022 | | | | Suspense Transaction | | 11118.34 | | | | | 11525.86 | 172963.35 | | -1104.71 | 448.60 | 11568.08 |
| 3/21/2022 | | | | Payments Posting | *7/01/2021 | 9860.56 | 325.15 | 396.37 | 536.26 | | -1257.78 | 172638.20 | | -568.45 | 448.60 | 10310.30 |
| 3/21/2022 | | | | Payments Posting | *8/01/2021 | 8602.78 | 325.89 | 395.63 | 536.26 | | -1257.78 | 172312.31 | | -32.19 | 448.60 | 9052.52 |
| 3/21/2022 | | | | Payments Posting | *9/01/2021 | 7413.99 | 326.64 | 394.88 | 467.27 | | -1188.79 | 171985.67 | | 435.08 | 448.60 | 7863.73 |
| 3/21/2022 | | | | Payments Posting | *10/01/2021 | 6225.20 | 327.39 | 394.13 | 467.27 | | -1188.79 | 171658.28 | | 902.35 | 448.60 | 6674.94 |
| 3/21/2022 | | | | Payments Posting | *11/01/2021 | 4980.16 | 328.14 | 393.38 | 523.52 | | -1245.04 | 171330.14 | | 1425.87 | 448.60 | 5429.90 |
| 3/21/2022 | | | | Payments Posting | *12/01/2021 | 3735.12 | 328.89 | 392.63 | 523.52 | | -1245.04 | 171001.25 | | 1949.39 | 448.60 | 4184.86 |
| 3/21/2022 | | | | Payments Posting | *1/01/2022 | 2490.08 | 329.64 | 391.88 | 523.52 | | -1245.04 | 170671.61 | | 2472.91 | 448.60 | 2939.82 |
| 3/21/2022 | | | | Payments Posting | *2/01/2022 | 1245.04 | 330.40 | 391.12 | 523.52 | | -1245.04 | 170341.21 | | 2996.43 | 448.60 | 1694.78 |
| 3/21/2022 | | | | Payments Posting | *3/01/2022 | 0.00 | 331.15 | 390.37 | 523.52 | | -1245.04 | 170010.06 | | 3519.95 | 448.60 | 449.74 |

| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin, Int & Esc Past Due Balance | H. Amount to Principal | I. Amount to Interest | J. Amount to Escrow | K. Amount to Fees or Charges | L. Unapplied Funds | M. Principal Balance | N. Accrued Interest Balance | O. Escrow Balance | P. Fees/Charges Balance | Q. Unapplied Funds Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/21/2022 | | | -247.52 | Late Fees | | 0.00 | | | | -247.52 | -247.52 | 170010.06 | | 3519.95 | 201.08 | 202.22 |
| 3/21/2022 | | | -160.00 | Fees Paid | | 0.00 | | | | -160.00 | -160.00 | 170010.06 | | 3519.95 | 41.08 | 42.22 |
| 3/21/2022 | | | -28.86 | Late Fees | | 0.00 | | | | -28.86 | | 170010.06 | | 3519.95 | 12.22 | 42.22 |
| 3/22/2022 | 250.00 | | | Billed -FC Title Cost | | 0.00 | | | | 250.00 | | 170010.06 | | 3519.95 | 262.22 | 42.22 |
| 3/22/2022 | | | -12.22 | Late Fees | | 0.00 | | | | -12.22 | -12.22 | 170010.06 | | 3519.95 | 250.00 | 30.00 |
| 3/22/2022 | | | | Principal Curtailment | | 0.00 | 30.00 | | | | -30.00 | 169980.06 | | 3519.95 | 250.00 | 0.00 |
| 3/24/2022 | | | 705.00 | Billed - FC Attorney Fee | | 0.00 | | | | 705.00 | | 169980.06 | | 3519.95 | 955.00 | 0.00 |
| 3/28/2022 | | | | Taxes Paid | | 0.00 | | | -166.46 | | | 169980.06 | | 3353.49 | 955.00 | 0.00 |
| 3/28/2022 | | | | Taxes Paid | | 0.00 | | | -660.31 | | | 169980.06 | | 2693.18 | 955.00 | 0.00 |
| 4/1/2022 | 1,245.04 | | | Contractual Payment Due | 4/1/2022 | 1245.04 | | | | | | 169980.06 | | 2693.18 | 955.00 | 0.00 |
| 4/4/2022 | | | | MIP Paid | | 1245.04 | | | -119.10 | | | 169980.06 | | 2574.08 | 955.00 | 0.00 |
| 4/18/2022 | | | 28.86 | Late Fees | | 1245.04 | | | | 28.86 | | 169980.06 | | 2574.08 | 983.86 | 0.00 |
| 5/1/2022 | 1,245.04 | | | Contractual Payment Due | 5/1/2022 | 2490.08 | | | | | | 169980.06 | | 2574.08 | 983.86 | 0.00 |
| 5/4/2022 | | | | MIP Paid | | 2490.08 | | | -119.10 | | | 169980.06 | | 2454.98 | 983.86 | 0.00 |
| 5/16/2022 | | | 28.86 | Late Fees | | 2490.08 | | | | 28.86 | | 169980.06 | | 2454.98 | 1012.72 | 0.00 |
| 5/27/2022 | | | | Insurance Paid | | 2490.08 | | | -1,275.00 | | | 169980.06 | | 1179.98 | 1012.72 | 0.00 |
| 6/1/2022 | 1,245.04 | | | Contractual Payment Due | 6/1/2022 | 3735.12 | | | | | | 169980.06 | | 1179.98 | 1012.72 | 0.00 |
| 6/3/2022 | | | | MIP Paid | | 3735.12 | | | -119.10 | | | 169980.06 | | 1060.88 | 1012.72 | 0.00 |
| 6/13/2022 | | | 20.00 | Billed - Inspection Fee | | 3735.12 | | | | 20.00 | | 169980.06 | | 1060.88 | 1032.72 | 0.00 |
| 6/16/2022 | | | 28.86 | Late Fees | | 3735.12 | | | | 28.86 | | 169980.06 | | 1060.88 | 1061.58 | 0.00 |
| 6/30/2022 | | | 20.00 | Billed - Inspection Fee | | 3735.12 | | | | 20.00 | | 169980.06 | | 1060.88 | 1081.58 | 0.00 |
| 7/1/2022 | 1,245.04 | | | Contractual Payment Due | 7/1/2022 | 4980.16 | | | | | | 169980.06 | | 1060.88 | 1081.58 | 0.00 |
| 7/5/2022 | | | | MIP Paid | | 4980.16 | | | -119.10 | | | 169980.06 | | 941.78 | 1081.58 | 0.00 |
| 7/18/2022 | | | | Taxes Paid | | 4980.16 | | | -697.93 | | | 169980.06 | | 243.85 | 1081.58 | 0.00 |
| 7/18/2022 | | | | Taxes Paid | | 4980.16 | | | -2,699.42 | | | 169980.06 | | -2455.57 | 1081.58 | 0.00 |
| 7/18/2022 | | | 28.86 | Late Fees | | 4980.16 | | | | 28.86 | | 169980.06 | | -2455.57 | 1110.44 | 0.00 |
| 7/27/2022 | | 1000.00 | | Funds Received | | 4980.16 | | | | | | 169980.06 | | -2455.57 | 1110.44 | 0.00 |
| 7/27/2022 | | | | Suspense Transaction | | 4980.16 | | | | | 1000.00 | 169980.06 | | -2455.57 | 1110.44 | 1000.00 |
| 8/1/2022 | 1,245.04 | | | Contractual Payment Due | 8/1/2022 | 6225.20 | | | | | | 169980.06 | | -2455.57 | 1110.44 | 1000.00 |
| 8/4/2022 | | | | MIP Paid | | 6225.20 | | | -116.32 | | | 169980.06 | | -2571.89 | 1110.44 | 1000.00 |
| 8/11/2022 | | | 20.00 | Billed - Inspection Fee | | 6225.20 | | | | 20.00 | | 169980.06 | | -2571.89 | 1130.44 | 1000.00 |
| 8/16/2022 | | | 28.86 | Late Fees | | 6225.20 | | | | 28.86 | | 169980.06 | | -2571.89 | 1159.30 | 1000.00 |
| 8/31/2022 | | | 20.00 | Billed - Inspection Fee | | 6225.20 | | | | 20.00 | | 169980.06 | | -2571.89 | 1179.30 | 1000.00 |
| 9/1/2022 | 1,245.04 | | | Contractual Payment Due | 9/1/2022 | 7470.24 | | | | | | 169980.06 | | -2571.89 | 1179.30 | 1000.00 |
| 9/2/2022 | | | | MIP Paid | | 7470.24 | | | -116.32 | | | 169980.06 | | -2688.21 | 1179.30 | 1000.00 |
| 9/16/2022 | | | 28.86 | Late Fees | | 7470.24 | | | | 28.86 | | 169980.06 | | -2688.21 | 1208.16 | 1000.00 |
| 9/29/2022 | | | 75.00 | Billed - FC Title Cost | | 7470.24 | | | | 75.00 | | 169980.06 | | -2688.21 | 1283.16 | 1000.00 |
| 10/1/2022 | 1,245.04 | | | Contractual Payment Due | 10/1/2022 | 8715.28 | | | | | | 169980.06 | | -2688.21 | 1283.16 | 1000.00 |
| 10/4/2022 | | | | MIP Paid | | 8715.28 | | | -116.32 | | | 169980.06 | | -2804.53 | 1283.16 | 1000.00 |
| 10/6/2022 | | | 1360.00 | Billed - FC Attorney Fee | | 8715.28 | | | | 1360.00 | | 169980.06 | | -2804.53 | 2643.16 | 1000.00 |
| 10/27/2022 | | | 20.00 | Billed - FC Inspection Fee | | 8715.28 | | | | 20.00 | | 169980.06 | | -2804.53 | 2663.16 | 1000.00 |
| 10/28/2022 | | | 340.00 | Billed - FC Attorney Fee | | 8715.28 | | | | 340.00 | | 169980.06 | | -2804.53 | 3003.16 | 1000.00 |
| 10/28/2022 | | | 248.25 | Billed - FC Filing Cost | | 8715.28 | | | | 248.25 | | 169980.06 | | -2804.53 | 3251.41 | 1000.00 |
| 10/28/2022 | | | 250.00 | Billed - FC Filing Cost | | 8715.28 | | | | 250.00 | | 169980.06 | | -2804.53 | 3501.41 | 1000.00 |
| 11/1/2022 | 1,377.18 | | | Contractual Payment Due | 11/1/2022 | 10092.46 | | | | | | 169980.06 | | -2804.53 | 3501.41 | 1000.00 |
| 11/4/2022 | | | | MIP Paid | | 10092.46 | | | -116.32 | | | 169980.06 | | -2920.85 | 3501.41 | 1000.00 |
| 11/17/2022 | | | -114.50 | Fees Waived | | 10092.46 | | | | -114.50 | | 169980.06 | | -2920.85 | 3386.91 | 1000.00 |
| 11/25/2022 | | | 680.00 | Billed - FC Attorney Fee | | 10092.46 | | | | 680.00 | | 169980.06 | | -2920.85 | 4066.91 | 1000.00 |
| 12/1/2022 | 1,377.18 | | | Contractual Payment Due | 12/1/2022 | 11469.64 | | | | | | 169980.06 | | -2920.85 | 4066.91 | 1000.00 |
| 12/2/2022 | | | 20.00 | Billed - Inspection Fee | | 11469.64 | | | | 20.00 | | 169980.06 | | -2920.85 | 4086.91 | 1000.00 |
| 12/2/2022 | | | | MIP Paid | | 11469.64 | | | -116.32 | | | 169980.06 | | -3037.17 | 4086.91 | 1000.00 |
| 12/16/2022 | | | 28.86 | Late Fees | | 11469.64 | | | | 28.86 | | 169980.06 | | -3037.17 | 4115.77 | 1000.00 |
| 12/22/2022 | | | 20.00 | Billed - Inspection Fee | | 11469.64 | | | | 20.00 | | 169980.06 | | -3037.17 | 4135.77 | 1000.00 |
| 1/1/2023 | 1,377.18 | | | Contractual Payment Due | 1/1/2023 | 12846.82 | | | | | | 169980.06 | | -3037.17 | 4135.77 | 1000.00 |
| 1/4/2023 | | | | MIP Paid | | 12846.82 | | | -116.32 | | | 169980.06 | | -3153.49 | 4135.77 | 1000.00 |
| 1/17/2023 | | | 28.86 | Late Fees | | 12846.82 | | | | 28.86 | | 169980.06 | | -3153.49 | 4164.63 | 1000.00 |
| 2/1/2023 | 1,377.18 | | | Contractual Payment Due | 2/1/2023 | 14224.00 | | | | | | 169980.06 | | -3153.49 | 4164.63 | 1000.00 |
| 2/3/2023 | | | 20.00 | Billed - Inspection Fee | | 14224.00 | | | | 20.00 | | 169980.06 | | -3153.49 | 4184.63 | 1000.00 |
| 2/3/2023 | | | | MIP Paid | | 14224.00 | | | -116.32 | | | 169980.06 | | -3269.81 | 4184.63 | 1000.00 |

# ///  MIDLAND MORTGAGE
### *A division of MidFirst Bank*

Mortgagor Name:   JARRED E FOX
Case Number:   23-10328

Bankruptcy Filing Date:   2/3/2023

## Pre-Petition Escrow Account Statement
### (for the purpose of calculating the pre-petition escrow shortage or surplus)

| Escrow Balance Analysis | | | Escrow Payment Analysis | | |
|---|---|---|---|---|---|
| Anticipated Low Point Balance | $ | 267.91 | Principal and Interest | $ | 721.52 |
| Less: Required Low Point Balance | $ | 916.52 | Escrow Deposit | $ | 458.26 |
| **Total Shortage** | $ | **(648.61)** | Mortgage Insurance Premiums | $ | 119.10 |
| | | | Optional Insurance | $ | - |
| Current Escrow Balance | $ | (3,269.81) | Deficiency | $ | - |
| Less: Unpaid Items | $ | - | Surplus Reductions | $ | - |
| Plus: Required Escrow Deposits | $ | 6,287.28 | Rounding Amount | $ | - |
| **Anticipated Escrow Balance** | $ | **3,017.47** | Less Buydown/Asst Amount | $ | - |
| | | | **Total Payment*** | $ | **1,298.88** |
| Anticipated Escrow Balance | $ | 3,017.47 | | | |
| Plus: Total Shortage | $ | (648.61) | | | |
| **Required Balance** | $ | **3,666.08** | **Post-Petition Due Date:** | | 3/1/2023 |

### Projected Account History

| Month | Amount Paid In | Amount Paid Out | Description | Anticipated | Required |
|---|---|---|---|---|---|
| | | | | 3,017.47 | 3,666.08 |
| MAR 23 | 577.36 | 119.10 | MIP PAID TO HUD | 3,475.73 | 4,124.34 |
| APR 23 | 577.36 | 119.10 | MIP PAID TO HUD | 3,933.99 | 4,582.60 |
| APR 23 | - | 660.31 | CITY/TOWNSHIP TAX | 3,273.68 | 3,922.29 |
| APR 23 | - | 166.46 | CITY/TOWNSHIP TAX | 3,107.22 | 3,755.83 |
| MAY 23 | 577.36 | 119.10 | MIP PAID TO HUD | 3,565.48 | 4,214.09 |
| JUN 23 | 577.36 | 119.10 | MIP PAID TO HUD | 4,023.74 | 4,672.35 |
| JUN 23 | - | 1,275.00 | HAZARD | 2,748.74 | 3,397.35 |
| JUL 23 | 577.36 | 119.10 | MIP PAID TO HUD | 3,207.00 | 3,855.61 |
| AUG 23 | 577.36 | 119.10 | MIP PAID TO HUD | 3,665.26 | 4,313.87 |
| AUG 23 | - | 2,699.42 | CITY/TOWNSHIP TAX | 965.84 | 1,614.45 |
| AUG 23 | - | 697.93 | CITY/TOWNSHIP TAX | 267.91 | 916.52 |
| SEP 23 | 577.36 | 119.10 | MIP PAID TO HUD | 726.17 | 1,374.78 |
| OCT 23 | 577.36 | 119.10 | MIP PAID TO HUD | 1,184.43 | 1,833.04 |
| NOV 23 | 577.36 | 119.10 | MIP PAID TO HUD | 1,642.69 | 2,291.30 |
| DEC 23 | 577.36 | 119.10 | MIP PAID TO HUD | 2,100.95 | 2,749.56 |
| JAN 24 | 577.36 | 119.10 | MIP PAID TO HUD | 2,559.21 | 3,207.82 |
| FEB 24 | 577.36 | 119.10 | MIP PAID TO HUD | 3,017.47 | 3,666.08 |

*If the pre-petition escrow account statement results in an escrow shortage, the shortage will be included in the proof of claim.  A post petition analysis will be conducted and the new payment will not include a pre-petition shortage.



# MIDLAND MORTGAGE
*A division of MidFirst Bank*

YOUR LOAN NUMBER : ███████

**\*\*\* POC DISCLOSURE ESCROW ACCOUNT HISTORY \*\*\***

| DATE | TRANSACTION TYPE | AMOUNT | ESC BAL |
|---|---|---|---|
| 3/28/2022 | PROPERTY TAX PAYMENT | ($166.46) | $3,353.49 |
| 3/28/2022 | PROPERTY TAX PAYMENT | ($660.31) | $2,693.18 |
| 4/4/2022 | MORTGAGE INSURANCE PREMIUM | ($119.10) | $2,574.08 |
| 5/4/2022 | MORTGAGE INSURANCE PREMIUM | ($119.10) | $2,454.98 |
| 5/27/2022 | PROPERTY INSURANCE PAYMENT | ($1,275.00) | $1,179.98 |
| 6/3/2022 | MORTGAGE INSURANCE PREMIUM | ($119.10) | $1,060.88 |
| 7/5/2022 | MORTGAGE INSURANCE PREMIUM | ($119.10) | $941.78 |
| 7/18/2022 | PROPERTY TAX PAYMENT | ($697.93) | $243.85 |
| 7/18/2022 | PROPERTY TAX PAYMENT | ($2,699.42) | ($2,455.57) |
| 8/4/2022 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($2,571.89) |
| 9/2/2022 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($2,688.21) |
| 10/4/2022 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($2,804.53) |
| 11/4/2022 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($2,920.85) |
| 12/2/2022 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($3,037.17) |
| 1/4/2023 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($3,153.49) |
| 2/3/2023 | MORTGAGE INSURANCE PREMIUM | ($116.32) | ($3,269.81) |

# NOTE

July 2, 2020
[Date]

Tustin,
[City]

California
[State]

94 E Church St., Stevens, PA 17578
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$176,739.00**    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Broker Solutions, Inc.dba New American Funding, a Corporation.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **2.750 %**.

The interest rate required by this Section 2 is the rate I will pay both before and after any Survival Event as defined in this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st       day of each month beginning on **August 1, 2020.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest and any other items in the order described in the Security Instrument before Principal. If, on **July 1, 2050,**              I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date." I will continue to pay those amounts both before and after any Survival Event as defined in this Note, until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.

I will make my monthly payments at  **P.O.Box 650076
Dallas, TX 75265-0076**

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$721.52.**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**PENNSYLVANIA FIXED RATE NOTE** – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**    3239 2/16
Modified for FHA 5/16
Ellie Mae, Inc

Initials: _JF_

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees. I will pay the Note Holder back for those expenses paid by the Note Holder both before and after any Survival Event as defined in this Note.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11.  EFFECT OF SURVIVAL EVENTS**

For purposes of this Note, "Survival Event" is defined as follows:

(a)  any default described in Section 6(B) of this Note;

(b)  Noteholder requiring me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount under Section 6(C) of this Note;

(c)  Noteholder requiring immediate payment in full of all sums secured by the Security Instrument;

(d)  the Maturity Date as defined in this Note;

(e)  the entry of any judgment against me under this Note; and

(f)  the entry of any judgment under the Security Instrument.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
JARRED FOX

Lender: Broker Solutions, Inc.dba New American Funding
NMLS ID: ██████
Broker:
NMLS ID: ██████
Loan Originator: Garry Seidel
NMLS ID: ██████

WITHOUT RECOURSE, PAY TO THE ORDER OF:

## MIDFIRST BANK

BROKER SOLUTIONS, INC.
dba NEW AMERICAN FUNDING
TUSTIN, CA

BY: _____
ENRICO ARVIELO, CEO

[Sign Original Only]

PENNSYLVANIA FIXED RATE NOTE – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    3239 2/16
Modified for FHA 5/16                                                                        Initials: JF
Ellie Mae, Inc.                                      Page 3 of 3

**When recorded, return to:**
**First American Mortgage Solutions**
**c/o New American Funding Post**
**Closing**
**1795 International Way**
**Idaho Falls , ID 83402**

**This document was prepared by:**
**Broker Solutions, Inc.dba New**
**American Funding**
**14511 Myford Road, Suite 100**
**Tustin, CA 92780**



——————————— [Space Above This Line For Recording Data] ———————————

## MORTGAGE



DEFINITIONS
Words used in multiple sections of this document are defined below and other words are
defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words
used in this document are also provided in Section 15.

**(A) "Security Instrument"** means this document, which is dated
**July 2, 2020,**                     together with all Riders to this document.

PENNSYLVANIA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)                        **Initials:** _____
Ellie Mae, Inc.                                    Page 1 of 22



**(B) "Borrower"** is    **JARRED FOX, AN UNMARRIED MA**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 1901 E Voorhees Street, Suite C, Danville, IL 61834. The MERS telephone number is (888) 679-MERS.
**(D) "Lender"** is    **Broker Solutions, Inc.dba New American Funding.**

Lender is  **a Corporation,**                                      organized and existing under the laws of  **California.**
Lender's address is  **14511 Myford Road, Suite 100, Tustin, CA 92780.**

**(E) "Note"** means the promissory note signed by Borrower and dated
**July 2, 2020.**                  The Note states that Borrower owes Lender  **ONE HUNDRED SEVENTY SIX THOUSAND SEVEN HUNDRED THIRTY NINE AND NO/100**\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* Dollars (U.S. **$176,739.00**      )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  **July 1, 2050.**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:
☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Planned Unit Development Rider
☐ Other(s) [specify]

PENNSYLVANIA–Single Family–**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)    Initials: _____ ⌐ F
Ellie Mae, Inc.                                    Page 2 of 22



**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's



covenants and agreements under this Security Instrument and the Note. For this pur-
pose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee
for Lender and Lender's successors and assigns) and to the successors and assigns of
MERS, with power of sale, the following described property located in the
**County**                                                     of  **Lancaster**
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF
AS "EXHIBIT A".**
**APN #:**

which currently has the address of    **94 E Church St., Stevens,**

[Street] [City]

Pennsylvania  **17578**                    ("Property Address"):
                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property,
and all easements, appurtenances, and fixtures now or hereafter a part of the property.
All replacements and additions shall also be covered by this Security Instrument. All of
the foregoing is referred to in this Security Instrument as the "Property." Borrower under-
stands and agrees that MERS holds only legal title to the interests granted by Borrower
in this Security Instrument, but, if necessary to comply with law or custom, MERS (as
nominee for Lender and Lender's successors and assigns) has the right: to exercise any
or all of those interests, including, but not limited to, the right to foreclose and sell the
Property; and to take any action required of Lender including, but not limited to, releasing
and canceling this Security Instrument.

PENNSYLVANIA–Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)                          **Initials:**
Ellie Mae, Inc.                                        Page 4 of 22



BORROWER COVENANTS that Borrower is lawfully ███████████████████████ conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.
Page 5 of 22

Form 3039 1/01 (rev. 2/16)
Initials: _____ $\mathcal{SF}$



**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any



or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation

secured by the lien in a manner acceptable to Lender, but ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
performing such agreement; (b) contests the lien in good faith by, or defends against
enforcement of the lien in, legal proceedings which in Lender's opinion operate to pre-
vent the enforcement of the lien while those proceedings are pending, but only until
such proceedings are concluded; or (c) secures from the holder of the lien an agree-
ment satisfactory to Lender subordinating the lien to this Security Instrument. If Lender
determines that any part of the Property is subject to a lien which can attain priority
over this Security Instrument, Lender may give Borrower a notice identifying the lien.
Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien
or take one or more of the actions set forth above in this Section 4.

**5. Property Insurance.** Borrower shall keep the improvements now existing or
hereafter erected on the Property insured against loss by fire, hazards included within
the term "extended coverage," and any other hazards including, but not limited to,
earthquakes and floods, for which Lender requires insurance. This insurance shall be
maintained in the amounts (including deductible levels) and for the periods that Lender
requires. What Lender requires pursuant to the preceding sentences can change during
the term of the Loan. The insurance carrier providing the insurance shall be chosen by
Borrower subject to Lender's right to disapprove Borrower's choice, which right shall
not be exercised unreasonably. Lender may require Borrower to pay, in connection
with this Loan, either: (a) a one-time charge for flood zone determination, certification
and tracking services; or (b) a one-time charge for flood zone determination and cer-
tification services and subsequent charges each time remappings or similar changes
occur which reasonably might affect such determination or certification. Borrower shall
also be responsible for the payment of any fees imposed by the Federal Emergency
Management Agency in connection with the review of any flood zone determination
resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may
obtain insurance coverage, at Lender's option and Borrower's expense. Lender is
under no obligation to purchase any particular type or amount of coverage. Therefore,
such coverage shall cover Lender, but might or might not protect Borrower, Borrower's
equity in the Property, or the contents of the Property, against any risk, hazard or liability
and might provide greater or lesser coverage than was previously in effect. Borrower
acknowledges that the cost of the insurance coverage so obtained might significantly
exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed
by Lender under this Section 5 shall become additional debt of Borrower secured by this
Security Instrument. These amounts shall bear interest at the Note rate from the date
of disbursement and shall be payable, with such interest, upon notice from Lender to
Borrower requesting payment.



All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 24 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)   Initials: _____
Ellie Mae, Inc.   Page 9 of 22



**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect



Lender's interest in the Property and/or rights under this ████████████████████████████
proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a
lien which may attain priority over this Security Instrument or to enforce laws or regula-
tions), or (c) Borrower has abandoned the Property, then Lender may do and pay for
whatever is reasonable or appropriate to protect Lender's interest in the Property and
rights under this Security Instrument, including protecting and/or assessing the value of
the Property, and securing and/or repairing the Property. Lender's actions can include,
but are not limited to: (a) paying any sums secured by a lien which has priority over this
Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to
protect its interest in the Property and/or rights under this Security Instrument, including
its secured position in a bankruptcy proceeding. Securing the Property includes, but is
not limited to, entering the Property to make repairs, change locks, replace or board up
doors and windows, drain water from pipes, eliminate building or other code violations
or dangerous conditions, and have utilities turned on or off. Although Lender may take
action under this Section 9, Lender does not have to do so and is not under any duty
or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all
actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt
of Borrower secured by this Security Instrument. These amounts shall bear interest at
the Note rate from the date of disbursement and shall be payable, with such interest,
upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provi-
sions of the lease. Borrower shall not surrender the leasehold estate and interests herein
conveyed or terminate or cancel the ground lease. Borrower shall not, without the express
written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title
to the Property, the leasehold and the fee title shall not merge unless Lender agrees to
the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous
Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to resto-
ration or repair of the Property, if the restoration or repair is economically feasible and
Lender's security is not lessened. During such repair and restoration period, Lender shall
have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity
to inspect such Property to ensure the work has been completed to Lender's satisfac-
tion, provided that such inspection shall be undertaken promptly. Lender may pay for the
repairs and restoration in a single disbursement or in a series of progress payments as
the work is completed. Unless an agreement is made in writing or Applicable Law requires
interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay



Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of



Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.



If the Loan is subject to a law which sets maximum
finally interpreted so that the interest or other loan charges collected or to be collected
in connection with the Loan exceed the permitted limits, then: (a) any such loan charge
shall be reduced by the amount necessary to reduce the charge to the permitted limit;
and (b) any sums already collected from Borrower which exceeded permitted limits will be
refunded to Borrower. Lender may choose to make this refund by reducing the principal
owed under the Note or by making a direct payment to Borrower. If a refund reduces
principal, the reduction will be treated as a partial prepayment with no changes in the
due date or in the monthly payment amount unless the Note holder agrees in writing to
those changes. Borrower's acceptance of any such refund made by direct payment to
Borrower will constitute a waiver of any right of action Borrower might have arising out
of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security
Instrument must be in writing. Any notice to Borrower in connection with this Security
Instrument shall be deemed to have been given to Borrower when mailed by first class
mail or when actually delivered to Borrower's notice address if sent by other means.
Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law
expressly requires otherwise. The notice address shall be the Property Address unless
Borrower has designated a substitute notice address by notice to Lender. Borrower shall
promptly notify Lender of Borrower's change of address. If Lender specifies a procedure
for reporting Borrower's change of address, then Borrower shall only report a change
of address through that specified procedure. There may be only one designated notice
address under this Security Instrument at any one time. Any notice to Lender shall be
given by delivering it or by mailing it by first class mail to Lender's address stated herein
unless Lender has designated another address by notice to Borrower. Any notice in con-
nection with this Security Instrument shall not be deemed to have been given to Lender
until actually received by Lender. If any notice required by this Security Instrument is
also required under Applicable Law, the Applicable Law requirement will satisfy the cor-
responding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument
shall be governed by federal law and the law of the jurisdiction in which the Property is
located. All rights and obligations contained in this Security Instrument are subject to
any requirements and limitations of Applicable Law. Applicable Law might explicitly or
implicitly allow the parties to agree by contract or it might be silent, but such silence shall
not be construed as a prohibition against agreement by contract. In the event that any
provision or clause of this Security Instrument or the Note conflicts with Applicable Law,
such conflict shall not affect other provisions of this Security Instrument or the Note which
can be given effect without the conflicting provision.

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)                          Initials:
Ellie Mae, Inc.                                    Page 14 of 22



As used in this Security Instrument: (a) words of the ma
and include corresponding neuter words or words of the fer████████████████████████
the singular shall mean and include the plural and vice versa; and (c) the word "may"
gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this
Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this
Section 17, "Interest in the Property" means any legal or beneficial interest in the Property,
including, but not limited to, those beneficial interests transferred in a bond for deed,
contract for deed, installment sales contract or escrow agreement, the intent of which is
the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred
(or if Borrower is not a natural person and a beneficial interest in Borrower is sold or
transferred) without Lender's prior written consent, Lender may require immediate pay-
ment in full of all sums secured by this Security Instrument. However, this option shall
not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The
notice shall provide a period of not less than 30 days from the date the notice is given
in accordance with Section 14 within which Borrower must pay all sums secured by this
Security Instrument. If Borrower fails to pay these sums prior to the expiration of this
period, Lender may invoke any remedies permitted by this Security Instrument without
further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain
conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions
are that Borrower: (a) pays Lender all sums which then would be due under this Security
Instrument and the Note as if no acceleration had occurred; (b) cures any default of any
other covenants or agreements; (c) pays all expenses incurred in enforcing this Security
Instrument, including, but not limited to, reasonable attorneys' fees, property inspec-
tion and valuation fees, and other fees incurred for the purpose of protecting Lender's
interest in the Property and rights under this Security Instrument; and (d) takes such
action as Lender may reasonably require to assure that Lender's interest in the Property
and rights under this Security Instrument, and Borrower's obligation to pay the sums
secured by this Security Instrument, shall continue unchanged. However, Lender is not
required to reinstate if: (i) Lender has accepted reinstatement after the commencement
of foreclosure proceedings within two years immediately preceding the commencement
of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on dif-
ferent grounds in the future, or (iii) reinstatement will adversely affect the priority of the
lien created by this Security Instrument. Lender may require that Borrower pay such



reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)   Initials: _____
Ellie Mae, Inc.   Page 16 of 22



Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

## 22. Grounds for Acceleration of Debt.

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

(i)  Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

(ii)  Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

(i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

(ii)  The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)    Initials:
Ellie Mae, Inc.    Page 17 of 22



his or her credit has not been approved in accordance with the requirements of
the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate
payment in full, but Lender does not require such payments, Lender does not waive
its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by
the Secretary will limit Lender's rights, in the case of payment defaults, to require
immediate payment in full and foreclose if not paid. This Security Instrument does not
authorize acceleration or foreclosure if not permitted by regulations of the Secretary.
**(e) Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the
Note are not determined to be eligible for insurance under the National Housing Act
within 60 days from the date hereof, Lender may, at its option, require immediate
payment in full of all sums secured by this Security Instrument. A written statement
of any authorized agent of the Secretary dated subsequent to 60 days from the date
hereof, declining to insure this Security Instrument and the Note, shall be deemed
conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may
not be exercised by Lender when the unavailability of insurance is solely due to
Lender's failure to remit a mortgage insurance premium to the Secretary.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree
as follows:

**23. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender
all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents
to collect the rents and revenues and hereby directs each tenant of the Property to pay
the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of
Borrower's breach of any covenant or agreement in the Security Instrument, Borrower
shall collect and receive all rents and revenues of the Property as trustee for the benefit
of Lender and Borrower. This assignment of rents constitutes an absolute assignment
and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall
be held by Borrower as trustee for benefit of Lender only, to be applied to the sums
secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all
of the rents of the Property; and (c) each tenant of the Property shall pay all rents due
and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not
perform any act that would prevent Lender from exercising its rights under this Section 23.

Lender shall not be required to enter upon, take control of or maintain the Property
before or after giving notice of breach to Borrower. However, Lender or a judicially

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)    Initials: _____
Ellie Mae, Inc.    Page 18 of 22



appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**24. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq. ) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.**

**25. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**26. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of



execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**27. Reinstatement Period.** Borrower's time to reinstate provided in Section 18 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**28. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**29. Effect of Survival Events.** Both before and after any Survival Event, as defined below, Borrower shall:

(a) pay Funds for Escrow Items or pay Escrow Items directly as provided in Section 3 of this Security Instrument;

(b) pay the amounts and take the actions required by Section 4 of this Security Instrument;

(c) maintain insurance coverages and take the other actions required by Section 5 of this Security Instrument;

(d) maintain, repair and restore the Property and take the other actions required by Section 7 of this Security Instrument;

(e) if this Security Instrument is on a leasehold, comply with all the provisions of the lease;

(f) treat any amounts disbursed by Lender under Section 9 of this Security Instrument as additional debt of Borrower secured by this Security Instrument;

(g) permit the collection and application of miscellaneous proceeds as required by Section 10 of this Security Instrument;

(h) pay the fees required by Section 13 of this Security Instrument;

(i) continue to abide by the restrictions and take the actions required by Section 21 of this Security Instrument;

(j) pay any collection expenses under Section 24 of this Security Instrument; and

(k) pay interest at the rate payable from time to time under the Note.

"Survival Event" means any of the following:

(a) any default described in the Note;

(b) Lender requiring Borrower to pay immediately the full amount of Principal which has not been paid and all the interest that Borrower owes on that amount under the Note;

(c) Lender requiring immediate payment in full of all sums secured by this Security Instrument as described in the Note and Sections 17 and 24 of this Security Instrument;

(d) the Maturity Date as defined in the Note;

(e) the entry of any judgment against Borrower under the Note; and

(f) the entry of any judgment under this Security Instrument.

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)   Initials:
Ellie Mae, Inc.                                  Page 20 of 22



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____   7/2/20  (Seal)
JARRED FOX                                                               DATE

State of PENNSYLVANIA
County of LANCASTER

This record was acknowledged before me on this, the 2ⁿᵈ day of July, 2020, by JARRED FOX.

_____
Signature of Notarial Officer
(STAMP)

Title of Officer

| COMMONWEALTH OF PENNSYLVANIA |
| NOTARIAL SEAL |
| Barbara A. Brown-Young, Notary Public |
| Manheim Twp., Lancaster County |
| My Commission Expires Oct. 22, 2021 |
| MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES |

My commission expires

Lender: Broker Solutions, Inc.dba New American Funding
NMLS ID:
Broker:
NMLS ID:
Loan Originator: Garry Seidel
NMLS ID:

PENNSYLVANIA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)   Initials:
Ellie Mae, Inc.                                   Page 21 of 22



Certificate of Residence

I, _____ _Barb_ _Brown_Young_____, do hereby certify
that the correct address of the within-named Mortgagee is P.O. Box 2026, Flint, MI 48501-2026.

Witness my hand this __2nd__ day of __July, 2020__

Agent of Mortgagee

PENNSYLVANIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3039 1/01 (rev. 2/16)
Modified by Ellie Mae, Inc. for FHA 9/2014 (HUD Handbook 4000.1)                              Initials:
Ellie Mae, Inc.                                        Page 22 of 22



# Exhibit A

TRACT NO. 1

ALL THAT CERTAIN messuage and tract of land, situate in the Township of East Cocalico, County of Lancaster and State of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at the northwest corner thereof, appoint in the road or highway leading from Reamstown to Hahnstown, said point being located fourteen (14) feet southward from a corner between land now or late of Melvin Weise and Helen Weise and now or late of John C. Fause, thence by a strip of land now or late of Melvin Weiss and Helen Weiss, North sixty-seven (67) degrees and forty-five (45) minutes East, one hundred twenty-seven (127.00) feet to a point in the west side of the creek, and one (1) foot east from the east side of a concrete wall; thence along the west side of said creek along said wall, one (1) foot east thereof, South eighteen (18) degrees and twelve (12) minutes East, one hundred sixty-five (165.00) feet to a point in said creek; thence leaving the creek, crossing an iron pin at the west side of said creek, by land now or late of the said Melvin Weise, South seventy-four (74) degrees and three (03) minutes West, one hundred twenty-four and five tenths (124.5) feet to a point in said Highway; thence along in same, North nineteen (19) degrees and fifteen (15) minutes West, one hundred fifty-three (153.00) feet to the place of BEGINNING.

CONTAINING seventy-three and five tenths (73.5) perches, as per survey made January 4, 1958 by Howard R. Ranck. R.S.

TRACT NO. 2

ALL THAT CERTAIN small parcel of land, situate in East Cocalico Township, Lancaster County, Pennsylvania, bounded and described according to survey made in April 1968, by Howard H. Ranck, Registered Surveyor, as follows, to wit:

BEGINNING at a point in the highway leading from Hahnstown to Reamstown a corner of land of the Grantees; thence along in said highway, North nineteen (19) degrees fifteen (15) minutes West, fourteen (14) feet to a point in the highway; thence by land of John Faust, North seventy (70) degrees ten (10) minutes East, eighty (80) feet to an iron pin and North five (05) degrees forty-five (45) minutes West, forty-five (45) feet to an iron pin; thence by land of Harry Zimmerman, North seventy-four (74) degrees five (05) minutes East, thirty-five (35) feet to appoint; thence by land of the Grantees, South eighteen (18) degrees twelve (12) minutes West fifty (50) feet to an iron pin; thence by land of the Grantees, South sixty-seven (67) degrees forty-five (45) minutes West, one hundred twenty-seven (127.00) feet to the place of BEGINNING.

CONTAINING ten and one half (10 ½) perches.

TRACT NO. 3

ALL THAT CERTAIN tract of land situate in the Township of East Cocalico, County of Lancaster and Commonwealth of Pennsylvania, bounded and described as follows:

BEGINNING at an iron pin in the middle of the public road leading from Hahnstown to Reamstown; thence in an along the middle of said road North five (5) degrees West, fifty (50) feet to an iron pin and corner of land now or late of Reuben Zimmerman; thence along land now or late of Reuben Zimmerman, North seventy-five (75) degrees East, eighty (80) feet to an iron pin on line of land now or late of Reuben Zimmerman and corner of land now or late of John W.

# Exhibit A

*(continued)*

Miller; thence along land now or late of John W. Miller, South five (5) degrees East, forty-five (45) feet to an iron pin and corner of land now or late of John W. Miller; thence along land now or late of John W. Miller, South seventy-three (73) degrees West, eighty (80) feet to the place of BEGINNING.

CONTAINING thirteen and five tenths (13.5) perches of land.

EXCEPTING THEREFROM PREMISES which were taken thru Condemnation by Commonwealth of Pennsylvania, Department of Highways, in Record Book S-58, Page 519 and Record Book E-59, Page 2.



**Lancaster County**
Ann M. Hess
Recorder of Deeds
150 N. Queen Street
Suite 315
Lancaster, PA  17603
Phone: 717-299-8238
Fax: 717-299-8393

0:13 PM

**LANCASTER COUNTY ROD**

**OFFICIAL RECORDING COVER PAGE**                    Page 1 of 25

| | |
|---|---|
| **Document Type:**   MORTGAGE - CORPORATE | **Transaction #:** |
| **Transaction Reference:** eSecureFile : | **Document Page Count:** |
| **Document Reference:** | **Operator Id:** |

| | |
|---|---|
| **RETURN TO:**  (Simplifile) | **SUBMITTED BY:** |
| Regal Abstract Lancaster - EAST COCALICO | Regal Abstract Lancaster - EAST COCALICO |
| TOWNSHIP | TOWNSHIP |
| 600A Eden Rd Ste A | 600A Eden Rd Ste A |
| Lancaster, PA 17601-4205 | Lancaster, PA 17601-4205 |
| (717) 399-9600 | |

**\* PROPERTY DATA:**
Parcel ID #:

Municipality:
School District:

**\* ASSOCIATED DOCUMENT(S):**

INSTRUMENT # : 6531182
RECORDED DATE: 07/06/2020 02:20:13 PM

I hereby CERTIFY that this document is
recorded in the Recorder of Deeds Office in
Lancaster County, Pennsylvania.

| FEES / TAXES: | |
|---|---|
| RECORDING FEE: MORTGAGE - | |
| CORPORATE | $13.00 |
| CRC #6544 | $2.00 |
| RIF #6543 | $3.00 |
| WRIT TAX | $0.50 |
| AFF HSG #6557 | $11.50 |
| PA SURCHARGE #6548 | $40.25 |
| EXTRA PAGE FEE | $40.00 |
| **Total:** | $110.25 |

Ann M. Hess
Recorder of Deeds

# PLEASE DO NOT DETACH
## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always controls.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT AFTER RECORDING FOR ADDITIONAL
INFORMATION.

**Lancaster County**
Ann M. Hess
Recorder of Deeds
150 N. Queen Street
Suite 315
Lancaster, PA  17603
Phone: 717-299-8238
Fax: 717-299-8393



INSTRUMENT # : 6698964
RECORDED DATE: 08/19/2022 04:14:46 PM



**LANCASTER COUNTY ROD**

## OFFICIAL RECORDING COVER PAGE
Page 1 of 3

| | |
|---|---|
| **Document Type:**    ASSIGNMENT OF MORTGAGE - CORPORATE<br>**Transaction Reference:** eSecureFile :<br>**Document Reference:** | **Transaction #:**<br>**Document Page Count:**<br>**Operator Id:** |
| **RETURN TO:  (**Simplifile)<br>First American Mortgage Solutions - EAST COCALICO TOWNSHIP<br>3 FIRST AMERICAN WAY<br>SANTA ANA, CA 92707<br>(817) 961-2308 | **SUBMITTED BY:**<br>First American Mortgage Solutions - EAST COCALICO TOWNSHIP<br>3 FIRST AMERICAN WAY<br>SANTA ANA, CA 92707 |

**\* PROPERTY DATA:**
Parcel ID #:

Municipality:
School District:

**\* ASSOCIATED DOCUMENT(S):**

|  |  |
|---|---|
| | INSTRUMENT # : 6698964<br>RECORDED DATE: 08/19/2022 04:14:46 PM |
| **FEES / TAXES:**<br>RECORDING FEE: ASSIGNMENT<br>OF MORTGAGE - CORPORATE          $13.00<br>CRC #6544                                       $2.00<br>RIF #6543                                         $3.00<br>WRIT TAX                                        $0.50<br>PA SURCHARGE #6548                    $40.25<br><br>**Total:**                                         **$58.75** | I hereby CERTIFY that this document is<br>recorded in the Recorder of Deeds Office in<br>Lancaster County, Pennsylvania.<br><br><br><br>Ann M. Hess<br>Recorder of Deeds |

# PLEASE DO NOT DETACH
## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always controls.
\*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT AFTER RECORDING FOR ADDITIONAL
INFORMATION.

**PENNSYLVANIA**
COUNTY OF **LANCASTER**
LOAN NO.▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

WHEN RECORDED MAIL TO.
FIRST AMERICAN MORTGAGE SOLUTIONS, 1795 INTERNATIONAL WAY, IDAHO FALLS, ID 83402, PH. **208-528-9895**

# ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt whereof is hereby acknowledged, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR BROKER SOLUTIONS, INC. D/B/A NEW AMERICAN FUNDING, ITS SUCCESSORS AND ASSIGNS** located at **1901 E VOORHEES STREET SUITE C, DANVILLE, IL 61834** or **P.O. Box 2026, FLINT, MICHIGAN 48501-2026**, Assignor, does hereby grant, bargain, assign, transfer, convey, and set over unto **BROKER SOLUTIONS, INC. D/B/A NEW AMERICAN FUNDING** located at **11001 LAKELINE BLVD #325, AUSTIN, TX 78717**, Assignee, its successors and assigns, that certain Mortgage dated **JULY 02, 2020** executed by **JARRED FOX, AN UNMARRIED MAN**, Mortgagor, to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR BROKER SOLUTIONS, INC. D/B/A NEW AMERICAN FUNDING, ITS SUCCESSORS AND ASSIGNS**, Original Mortgagee, in the amount of **$176,739.00** and recorded on **JULY 06, 2020** in the Office of the Register, Recorder, or County Clerk of **LANCASTER** County, State of **PENNSYLVANIA**, as Document No. **6531182**, more particularly described and commonly known as:

**AS DESCRIBED IN SAID DEED OF TRUST**
Property Address: **94 E CHURCH ST., STEVENS, PA 17578**
**TOWNSHIP OF EAST COCALICO**

TOGETHER WITH all rights, title, and interest in and to the premises, accrued or to accrue under said Mortgage.

TO HAVE AND HOLD the same unto Assignee, its successors and assigns, to Assignees proper use and benefit.

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on **AUGUST 18, 2022**.

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR BROKER SOLUTIONS, INC. D/B/A NEW AMERICAN FUNDING, ITS SUCCESSORS AND ASSIGNS**

**ADDISON RICE, VICE PRESIDENT**

**Page 1 of 2**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**MIN:**▮▮▮▮▮▮▮▮
**MERS PHONE:**▮▮▮▮▮▮▮▮

STATE OF **IDAHO**          COUNTY OF **BONNEVILLE**     ) ss.

On **AUGUST 18, 2022**, before me, **CANDELARIA SALMERON**, personally appeared **ADDISON RICE** known to me to be the **VICE PRESIDENT** of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR BROKER SOLUTIONS, INC. D/B/A NEW AMERICAN FUNDING, ITS SUCCESSORS AND ASSIGNS** the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

*Candelaria Salmeron*

**CANDELARIA SALMERON (COMMISSION EXP. 12/17/2027)**
NOTARY PUBLIC

> CANDELARIA SALMERON
> Notary Public - State of Idaho
> Commission Number 20216027
> My Commission Expires Dec 17, 2027

I do hereby certify that the precise address of the Assignee Residence is:
**BROKER SOLUTIONS, INC. D/B/A NEW AMERICAN FUNDING, 11001 LAKELINE BLVD #325, AUSTIN, TX 78717**

**ADDISON RICE, VICE PRESIDENT**

LOAN NO.: